

JC/ES: USAO 2019R00847

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | *  CRIMINAL NO. DLB 25 CR 00397 |
| | * |
| LENNIE LAMONT MILLER, SR., | *  (Conspiracy to Commit Bribery of a |
| | *  Federal Official, 18 U.S.C. §§ 371, |
| Defendant | *  201(b)(2)(A); Forfeiture, |
| | *  18 U.S.C. § 981(a)(1)(C), |
| | *  21 U.S.C. § 853(p), 28 U.S.C. § 2461(c)) |
| | * |

******

## INFORMATION

### COUNT ONE
(Conspiracy to Commit Bribery of a Federal Official)

The United States Attorney for the District of Maryland and the Acting Chief of the Public Integrity Section, Criminal Division, United States Department of Justice charge that:

### Introduction

1. Christopher Brackins formed Company A in the mid-to-late 1990s to perform general construction work. Brackins was the sole owner of Company A.

2. The General Services Administration (GSA) was an agency of the executive branch of the United States government. Among other things, GSA was responsible for the development and management of property owned or leased by the federal government.

3. At all relevant times, the defendant, **LENNIE LAMONT MILLER, SR.**, a Maryland resident, was a contracting officer's representative employed by the GSA.

4. Brackins first met **MILLER** in or about 2007 or 2008 when Brackins was looking for federal contract work for Company A.

5. Between in or about 2018 and in or about 2021, Company A performed subcontracting work on certain GSA federal projects under prime contractor Company B and prime contractor Company C. Some of these GSA contracts were overseen on a day-to-day basis by **MILLER**.

### The Conspiracy

6. Beginning in or about late 2018 and continuing until in or about late 2021, in the District of Maryland and elsewhere, the defendant,

**LENNIE LAMONT MILLER, SR.,**

and Brackins did knowingly and willfully combine, conspire, and agree together and with each other to engage in a corrupt scheme whereby **MILLER** exercised his authority over the GSA contracting process to direct GSA federal project work to Company A, a company owned by Brackins, in exchange for cash and other things of value provided by Brackins and Company A, in violation of 18 U.S.C. § 201(b)(2)(A).

### Manner and Means of the Conspiracy

The manner and means of the conspiracy included, but were not limited to, the following:

7. **MILLER** effectively paired Company A (Brackins's company) with prime contractors Company B and Company C to work on GSA federal projects.

8. **MILLER** solicited and accepted things of value from Brackins, including cash, checks, payments for repairs to **MILLER**'s vehicle, and payments for repairs at a residence owned by **MILLER**'s relative.

9. In exchange for these things of value, **MILLER** directed GSA federal project work to Company A by causing GSA federal project work to be subcontracted from Companies B and C to Company A.

**Overt Acts**

In furtherance of the conspiracy and to achieve its purposes, Brackins and **MILLER** committed the following overt acts, among others, in the District of Maryland and elsewhere:

10. Between in or about 2018 and 2021, **MILLER** operated out of a GSA facility at the St. Elizabeths Hospital campus in southeast Washington, D.C. There were several prime contractors working at the St. Elizabeths site, including Company B.

11. In or about late 2018, **MILLER** was overseeing a roof repair project at the St. Elizabeths site for which Company B was serving as a prime contractor and Company A was serving as a subcontractor. Near the end of the completion of the project, **MILLER** asked Brackins for $8,000 in cash in exchange for **MILLER**'s assistance in securing Company A's subcontract with prime contractor Company B. Brackins agreed to pay the funds to **MILLER**. Accordingly, in or about November 2018, Brackins provided funds to one of Brackins's employees and directed the employee to pay **MILLER** approximately $8,000 in cash.

12. In or about January 2019, **MILLER** again solicited a payment from Brackins while Brackins was working on another project at the St. Elizabeths campus. Brackins agreed to pay **MILLER** with a $3,800 check from Company A's account, issued with the memo line "Chevy 2500 HD," even though Brackins did not engage in any transaction with **MILLER** involving a vehicle of that make and model.

13. On or about January 29, 2019, **MILLER** certified that the roof repair project at the St. Elizabeths site had been completed, a prerequisite to GSA's subsequent release of payment to Company B (which, in turn, paid Company A).

14. In or about mid-2020, **MILLER** invited Brackins to inspect a building on the St. Elizabeths campus called the Atkins Hall Building (also referred to as Building 31). The building required mold remediation and certain general repair work.

15. Brackins offered some guidance to **MILLER** on the scope of work that would be necessary to remediate the Atkins Hall Building. Brackins provided an estimate of his costs, including profit and overhead. **MILLER** suggested adding a 10 percent "contingency," which was abnormal for GSA projects.

16. Ultimately, Company C bid on the project, secured a contract for approximately $800,000, and subcontracted much of the work to Company A.

17. During and while Brackins and Company A were working on the Atkins Hall Building remediation project in late 2020 and early 2021, **MILLER** solicited, demanded, and accepted payments from Brackins, including but not limited to:

    a. In or about December 2020, Brackins, through a relative, paid approximately $3,100 to a Maryland-based vehicle repair shop for repairs to a vehicle owned by **MILLER**.

    b. In or about January 2021, Brackins paid a contractor approximately $8,000 to pay for repairs at a residence owned by **MILLER**'s relative.

    c. In or about February and March 2021, Brackins paid $25,000 to **MILLER** using an intermediary, an individual with a long-standing relationship to **MILLER**. **MILLER** solicited the intermediary to accept the payments on **MILLER**'s behalf. Brackins paid the intermediary $25,000 in three payments. The intermediary in turn quickly remitted the funds in their entirety to **MILLER**.

18. **MILLER** solicited and accepted these things of value from Brackins in exchange for **MILLER**'s official action in directing GSA federal project work to Company A by causing GSA federal project work to be subcontracted to Company A. **MILLER** caused Brackins to believe that **MILLER** would withhold federal project work from Company A if Brackins did not make the payments.

18 U.S.C. § 371
18 U.S.C. § 201(b)(2)(A)

## COUNT TWO
### (Conspiracy to Commit Bribery of a Federal Official)

The United States Attorney for the District of Maryland and the Acting Chief of the Public Integrity Section, Criminal Division, United States Department of Justice further charge that:

### Introduction

1. James Tillman formed Company D in or about 2008 to perform general construction work. Tillman was the sole owner of Company D.

2. The General Services Administration (GSA) was an agency of the executive branch of the United States government. Among other things, GSA was responsible for the development and management of property owned or leased by the federal government.

3. At all relevant times, **MILLER**, a Maryland resident, was a contracting officer's representative employed by the GSA.

4. In or about 2020 and 2021, **MILLER** operated out of a GSA facility at the St. Elizabeths West Campus, located in Southeast Washington, D.C. There were several prime contractors working at the St. Elizabeths West Campus, including Company C (and certain related entities, referred to here collectively as "Company C").

5. Tillman first met **MILLER** in or about 2017 or 2018 when Tillman was looking for federal contract work for Company D.

6. In or about 2020 and 2021, Company D performed subcontracting work on certain GSA federal projects under prime contractor Company C. These GSA contracts were overseen on a day-to-day basis by **MILLER**.

6

### The Conspiracy

7. Beginning in or about early 2020 and continuing until at least mid-2021, in the District of Maryland and elsewhere, the defendant,

**LENNIE LAMONT MILLER, SR.,**

and Tillman did knowingly and willfully combine, conspire, and agree together and with each other to engage in a corrupt scheme whereby **MILLER** exercised his authority over the GSA contracting process to direct GSA federal project work to Company D, a company owned by Tillman, in exchange for cash and other things of value provided by Tillman and Company D, in violation of Title 18, United States Code, Section 201(b)(2)(A).

### Manner and Means

The manner and means of the conspiracy included, but were not limited to, the following:

8. **MILLER** introduced Tillman to Company C personnel and effectively paired Company D and Company C together to bid on GSA federal projects.

9. **MILLER** told Tillman to fraudulently inflate the costs associated with projects on which Company C was bidding (and on which Company D was the anticipated subcontractor).

10. **MILLER** then solicited and accepted things of value from Tillman, including cash, moving expenses for **MILLER**'s romantic partner, and a sports car.

### Overt Acts

In furtherance of the conspiracy and to achieve its purposes, Tillman and **MILLER** committed the following overt acts, among others, in the District of Maryland and elsewhere:

11. In or about 2020, **MILLER** invited Tillman to work on some construction projects at the St. Elizabeths West Campus.

12. Because Tillman had no relationship with any of the prime contractors generally working at the site, **MILLER** offered to facilitate an introduction to Company C personnel and eventually introduced Tillman to one of Company C's supervisors.

13. In or about early 2020, **MILLER** began seeking a contractor who could place privacy film on certain interior office windows in a building on the St. Elizabeths West Campus.

14. Company C ultimately bid on the work as the prime contractor, and **MILLER** effectively ensured that Company D would serve as the subcontractor on the project.

15. **MILLER** told Tillman to substantially inflate his estimated costs and GSA ultimately accepted the inflated proposal.

16. Between in or about April 2020 and in or about June 2020, Company D in fact completed the window film project with the assistance of another subcontractor.

17. While the window film project was underway, **MILLER** informed Tillman about a future potential project involving the remediation of sinkholes at the St. Elizabeths West Campus.

18. Before and during this period, **MILLER** solicited and accepted numerous things of value from Tillman, including:

    a. Before the window film project began, at a time when **MILLER** was suggesting to Tillman that **MILLER** was planning to direct GSA subcontracting work toward Tillman and Company D, **MILLER** solicited a total of approximately $8,000 in cash from Tillman on different occasions, which Tillman paid.

    b. In or about mid-2020, **MILLER** solicited $10,000 in cash, which Tillman paid to **MILLER** in a parking lot in Clinton, Maryland.

   c. In or about May 2020, **MILLER** demanded that Tillman pay approximately $2,500 in moving expenses so that **MILLER**'s romantic partner could move to a new residence.

   d. In or about mid-2020, Tillman agreed to pay **MILLER**—who had repeatedly asked Tillman to direct construction work to **MILLER**'s private business—$3,800 for work that **MILLER** and **MILLER**'s relative performed at Tillman's relative's residence.

   e. In or about 2020, Tillman agreed to provide **MILLER** with approximately $2,000 worth of seafood that Tillman had obtained at a discount.

  19. In or about late 2020 and early 2021, **MILLER** was preparing for a GSA project involving the remediation of sinkholes at the St. Elizabeths West Campus, specifically at the intersection of Ash and Birch Streets.

  20. Although Tillman's company, Company D, had no experience remediating sinkholes, **MILLER** effectively paired Company C (the prime contractor) with Company D as a subcontractor to prepare a proposal for the work.

  21. In or about April 2021, Company C bid on the work for approximately $634,000, and GSA accepted the proposal.

  22. During this period, **MILLER** informed Tillman that **MILLER** wanted Tillman to purchase a vehicle for **MILLER** using the funds Tillman earned through Company D's work on the sinkhole project.

  23. Between in or about June 2021 and in or about August 2021, Company D performed much of the work remediating the sinkholes with the assistance of another subcontractor and collected hundreds of thousands of dollars from Company C in connection with the project.

24.     On or about July 6, 2021, **MILLER** certified the completion of a portion of the work on the St. Elizabeths sinkhole remediation project.

25.     During and around this period, **MILLER** solicited and accepted numerous things of value from Tillman, including:

   a.     In or about July 2021, **MILLER** selected the used sports car that **MILLER** then asked Tillman to purchase on **MILLER**'s behalf.

   b.     On or about July 22, 2021, **MILLER** texted Tillman the name of the owner of the sports car, told Tillman to make a check payable to the car's owner, and added "The [car emoji] 8500.00."

   c.     On or about July 23, 2021, Tillman wrote a check for $8,500 on Company D's checking account to the owner of the sports car.

   d.     In or about 2021, **MILLER** solicited approximately $25,000 in cash from Tillman, which Tillman paid.

18 U.S.C. § 371
18 U.S.C. § 201(b)(2)(A)

10

## FORFEITURE ALLEGATION

The United States Attorney for the District of Maryland and the Acting Chief of the Public Integrity Section, Criminal Division, United States Department of Justice further allege that:

1. Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), in the event of the defendant's conviction of the offenses set forth in Counts One through Two of this Information.

2. Upon conviction of the offenses set forth in Count One and Two, the defendant,

**LENNIE LAMONT MILLER, SR.,**

shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such offense.

### Substitute Assets

3. If, as a result of any act or omission of the defendant, any such property subject to forfeiture:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third person;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be subdivided without difficulty,

the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 28 U.S.C. 2461(c), shall be entitled to forfeiture of substitute property.

18 U.S.C. § 981(a)(1)(C)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c).

Date: 12/30/2025

*Kelly O. Hayes* /JC
Kelly O. Hayes
United States Attorney

*Edward Sullivan* /JC
Edward P. Sullivan
Acting Chief, Public Integrity Section
U.S. Department of Justice